IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| AMANDA LOIS BROWN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 3:20-cv-838-ECM |
| | ) | [WO] |
| CITY OF VALLEY, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

This case concerns the November 21, 2019 arrest of Amanda Lois Brown ("Brown") by City of Valley, Alabama (the "City") police officers Dewayne Vallia ("Vallia") and Jaquarious Rashaan Lockhart ("Lockhart") (collectively, the "Defendants"). Brown brings two 42 U.S.C. § 1983 claims, "excessive force" and "false arrest and imprisonment" (Counts I and II), and two similar state claims, "assault and battery" and "false arrest and imprisonment" (Counts III and IV). (*See generally* doc. 38).[1]

Brown filed this suit on October 15, 2020. (Doc. 1).[2] This case was stayed from March 11, 2021 to February 18, 2026, pending resolution of criminal proceedings against Brown arising out of her arrest. (*See* docs. 19, 32; *see also* discussion *infra* Part III.C). On March 6, 2026, Brown filed an amended complaint. (Doc. 38). The Defendants now move

---

[1] Brown also sought injunctive relief against the City and equitable relief against all the Defendants on her § 1983 claims. Brown now concedes that she lacks standing to seek injunctive and equitable relief on Counts I and II. (Doc. 47 at 45). The Court agrees and finds that Brown lacks standing to seek injunctive and equitable relief on Counts I and II because she fails to allege facts that indicate "a sufficient likelihood that [s]he will again be [injured] in a similar way." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983).

[2] For clarity, the Court refers to the document and page numbers generated by CM/ECF.

to dismiss Brown's amended complaint, asserting that she fails to state a claim as to every count; Vallia and Lockhart raise qualified immunity as to the federal claims. (*See generally* doc. 39). The motion is fully briefed, (docs. 40, 47, 50), and upon review, the Court finds that Counts I and II are due to be dismissed with prejudice and Counts III and IV without prejudice.

## I. JURISDICTION AND VENUE

The Court has jurisdiction over Brown's federal claims. *See* 28 U.S.C. §§ 1331 and 1343. Personal jurisdiction and venue are uncontested, and the Court concludes that venue properly lies in the Middle District of Alabama. *See* 28 U.S.C. § 1391.

## II. STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (citation omitted). The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678. Conclusory allegations that are merely "conceivable" and fail to rise "above the speculative level" are insufficient. *Twombly*, 550 U.S. at 555–56. This pleading standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. Indeed, "[a] pleading that

offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

## III. FACTS[3]

### A. The Investigation

On November 19, 2019, the City's police department received a call from Brown (approximately forty-years-old), who stated she "was physically attacked by her [fifteen]-year[-]old[] adopted brother." (Doc. 38 at 2, para. 6). Lockhart responded to the call at Brown's residence. (*Id.* at 2, para. 7). The subsequent investigation and arrest were captured by body cameras worn by Vallia and Lockhart. (*See* docs. 40-1–3).[4]

At the scene, Brown told Lockhart that "he . . . whooped my ass pretty good, but I got my licks in too. I had to grab a stick to defend myself." (Doc. 40-2 at 00:00–05). As

[3] At the motion to dismiss stage, the Court "must view the complaint in the light most favorable to [Brown] and accept all of [Brown's] well-pleaded facts as true." *Am. United Life Ins. v. Martinez*, 480 F.3d 1043, 1057 (11th Cir. 2007) (citation omitted).

[4] Generally, "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." FED. R. CIV. P. 12(d). One exception to this conversion rule is the incorporation-by-reference-doctrine. *Baker v. City of Madison*, 67 F.4th 1268, 1276 (11th Cir. 2023) (citation omitted). Incorporation-by-reference doctrine permits the consideration of documents attached to a complaint or motion to dismiss that are "(1) central to the plaintiff's claim; and (2) undisputed." *See Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002) (citing *Harris v. Ivax Corp.,* 182 F.3d 799, 802 n.2 (11th Cir. 1999)). "'Undisputed' in this context means that the authenticity of the document is not challenged." *Id.* The Eleventh Circuit has allowed the consideration of body camera footage from police officers which meets these requirements. *See, e.g.*, *Johnson v. City of Atlanta*, 107 F.4th 1292, 1300–01 (11th Cir. 2024); *Baker*, 67 F.4th at 1277. And "where a video is clear and obviously contradicts the plaintiff's alleged facts, [courts] accept the video's depiction instead of the complaint's account, and view the facts in the light depicted by the video." *Baker*, 67 F.4th at 1277–78 (citing *Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313, 1315 (11th Cir. 2010); *Scott v. Harris*, 550 U.S. 372, 381 (2007)).

Because the Defendants have appended body camera videos and related state court filings which are central to Brown's claim and undisputed, the Court too considers those materials, and—to the extent they are ambiguous—the Court does so in the light most favorable to Brown. *See Baker*, F.4th at 1277 (citing *Speaker v. U.S. Dep't of Health & Hum. Servs.*, 623 F.3d 1371, 1379 (11th Cir. 2010)).

Lockhart turned away, she said, "he was a big boy . . . I had to do what I had to do." (*Id.* at 00:13–16). She informed Lockhart that "he" was Brown's brother who lived with her. (*Id.* at 00:22–28).

Once back in his police car, Lockhart "drove past [Brown]'s residence to the residence of . . . [Brown]'s grandmother," (*id.* at 3, para. 7), exited the vehicle, and began to speak with Brown's brother, (*id.* at 00:59–01:02). Brown's brother, crying, told Lockhart, "I just got the shit beat out of me." (*Id.* at 01:00–01:04). He further stated that, "I wasn't trying to fight, . . . she has me running and then she started hitting me, and I grabbed the stick from her and then she hit me in the head. She started screaming [that] I was trying to hit her." (*Id.* at 01:05–30).

After Lockhart's arrival at her grandmother's house, Brown walked over and attempted to talk to Lockhart; Lockhart told her to stay where she was before. (*Id.* at 01:30–42; doc. 38 at 3, para. 8). Brown's brother, sobbing, shouted, "please get away." (Doc. 40-2 at 01:35–38). After Lockhart turned back to Brown's brother, he told Lockhart, "she stabbed me"; Brown's brother can be seen bleeding from scratches on his arm as Brown's mother attempted to treat his wounds. (*Id.* at 01:40–02:35). Lockhart verbally noted "a knot on his head." (*Id.* at 02:32–35). Brown's brother stated, "I had pieces of wood stuck in my arm that I pulled out." (*Id.* at 02:35–39). Brown's mother requested emergency medical services for him. (*Id.* at 02:40–45). Lockhart then walked back toward Brown, "to get her side of the story," meeting up with Vallia who had just arrived. (*Id.* at 02:46–03:25; doc. 40-1 at 00:10–14). Vallia remarked that he was told that "she was hitting him in the

. . . head with a broomstick," to which Lockhart responded, "yeah, that's what he [was] saying." (Doc. 40-1 at 00:10–17).

Then, Vallia and Lockhart met Brown, who explained to them:

> [W]e started our routine yesterday, we start exercising around four o'clock or so. . . . I told him to sit in the chair and I'll be right down. . . . I said, "okay, let's get started." I take this little bitty stick right there to tap on the ground, like, "that's the time to run." Well, we get out there and [I] say "alright, that's the time to run." Then we run, then we stop. Then we run then we stop. He turned around, talking [a]bout, "no I ain't doing nothing" . . . . I said, "well, okay, then we need to sit down and calm down" . . . . Well, he didn't want to sit down. He . . . reached his hand out . . . he got a little hold to me but I took a lick and I said, "now look, sit down." He finally sat down over here, but then he got right back up and he come at me. . . . he was grabbing at me, trying to get me down, so I grabbed that stick and I was doing what I had to do. The stick broke and he was still coming at me. Well, hell, he's a big ass boy. I did what I had to do to get the hell out from him.

(Doc. 40-2 at 03:30–04:40). Another family member of Brown's, standing nearby, told the officers that Brown's brother had attacked him in the past. (*Id.* at 05:06–05:13). Brown then admitted to having "popped" her brother when he put his arm up. (*Id.* at 06:10–16).

The officers walked back to Brown's brother. (*Id.* at 06:40–07:00; doc. 38 at 3–4, para. 11). Still crying, he told them:

> As I started running, cause she told me to run, she started hitting me in the back of the leg. . . . I was running and she catched up and she started beating me. And then, I turned around and grabbed the stick and slung it down, and she scream[ed], "don't hit me." So I back[ed] down like five feet.

(Doc. 40-2 at 08:00–23). He further told the officers that two of his friends, as well as his cousins and family, saw it happen. (*Id.* at 08:24–42).

Brown's mother told the officers that Brown's brother had attacked her before and was difficult to deal with. (*Id.* at 09:30–50). She said he had anger issues, to which Brown's brother interrupted, stating, "yes sir, but I was not on her, I swear to God." (*Id.* at 10:45–51). Brown's mother informed the officers that Brown "has Asperger's."[5] (Doc. 40-1 at 16:28–32). Vallia and Lockhart explained to Brown's mother that they were going to arrest both Brown and Brown's brother for "domestic violence." (*Id.* at 16:50–17:10). They arrested Brown's brother and placed him in a police car. (*Id.* at 16:55–17:10; doc. 40-3 at 00:00–30).

**B. The Arrest**

Vallia and Lockhart walked over to Brown's home, and Vallia told Brown, who was outside, to approach them. (Doc. 40-3 at 02:00–10). Brown moved toward the officers and her mother told her that Vallia and Lockhart were going to arrest her. (*Id.* at 02:24–40). Brown turned around and walked away; she entered her house and shut the door as Vallia and her mother called to her to stay outside. (*Id.* at 02:41–48). Brown's mother then entered the house. (*Id.* at 02:55–03:33). Brown's mother later exited the house without Brown and told Vallia and Lockhart that Brown was not inside. (*Id.* at 04:18–39). Vallia and Lockhart waited outside for several more minutes (*Id.* at 04:40–10:40).

Eventually, Brown emerged from the house and told Vallia and Lockhart, "I have a right to defend myself. I'm not go[ing] to sit there and get my ass whooped. He came at

[5] Asperger's is "a pervasive developmental disorder characterized by severe and enduring impairment in social skills and restrictive and repetitive behaviors and interests, leading to impaired social and occupational functioning but without significant delays in language development . . . ." *Asperger Disorder*, STEDMAN'S MEDICAL DICTIONARY (Jan. 2025 ed.).

me and I did the best I could do." (*Id.* at 10:47–11:04). Contemporaneously, Brown's mother told the officers, "she took a butt load . . . of pills . . . that's all I can tell you," (*id.* at 10:53–11:01), and Vallia indicated to Lockhart to arrest Brown, (*id.* at 10:58–11:03).

Lockhart then approached Brown and told her to provide her hands to him. (*Id.* at 11:03–11:07). As he approached, Brown turned, said "nuh uh," and walked back toward her house. (*Id.* at 11:05–09). Vallia told Brown, "take your hands out of your pockets" and drew his taser. (*Id.* at 11:09–12). Brown lowered herself to the ground with her hands out of view, in front of her chest. (*Id.* at 11:13–22). Simultaneously, Vallia told her to put her hands behind her back and warned her that he would tase her if she did not comply. (*Id.* at 11:18–22). Brown then yelled at officers, faced toward the ground, "I have autism, please back up" and "if you tase me, I'm taking you to court." (*Id.* at 11:22–35). Vallia then holstered his taser and Lockhart drew his. (*Id.* at 11:33–36). Brown's mother knelt on the ground to Brown's right, urging Brown to comply. (*Id.* at 11:30–36).

Vallia grabbed Brown's left arm; Lockhart pressed his taser against her back and told Brown to place her hands behind her back. (*Id.* at 11:35–37). Brown had her right hand behind her back and Vallia held Brown's left arm; Vallia fastened a cuff on her left wrist. (*Id.* at 11:34–38). Lockhart again told Brown to put her hands behind her back. (*Id.* at 11:38–42). Vallia attempted to pull both of Brown's wrists together. (*Id.* at 11:44–46). Brown stated, "I can't take this," and began to rise. (*Id.* at 11:46–47). Lockhart engaged his taser on Brown's back for approximately four seconds. (*Id.* at 11:47–51). Brown shook and was pushed prone against the ground by Vallia. (*Id.* at 11:50–53). She turned on her side and brought her right arm to the ground, and said, "please don't do that again." (*Id.* at

11:53–57). She moved both arms in front of her; Vallia pulled her left arm back and Brown moved her right arm behind her back; Vallia finished successfully handcuffing Brown. (*Id.* at 11:58–12:09).

Lockhart attempted to lift Brown by her handcuffs, and Brown screamed in pain. (*Id.* at 12:15–34; *see* doc. 38 at 5, para. 16). Lockhart left Brown on the ground and she complained that her handcuffs were too tight. (Doc. 40-3 at 12:40–13:10). Lockhart and an off-duty officer—Brown's neighbor who had arrived during the struggle—loosened the handcuffs. (*Id.* at 13:01–13:20; doc. 38 at 5, para. 16).

Brown stated that she took "about three . . . Seroquel, ten Klonopin, and all [her] other medicine." (Doc. 40-3 at 13:30–36). Lockhart instructed Brown to roll over and get on her knees. (*Id.* at 13:43–54). Lockhart helped Brown to stand. (*Id.* at 13:55–14:14). Lockhart walked Brown over to his police car and opened the door. (*Id.* at 14:44–15:35). Brown saw her brother in the car, and turned and walked away, stating, "I ain't getting in there with him." (*Id.* at 15:36–43). Vallia told her, "you don't have a choice," and Brown complied, turning around and getting in the vehicle. (*Id.* at 15:40–55).

On the way to the police station, Brown "lost consciousness as a result of the pain she was suffering from the tasing and her . . . treatment by . . . Lockhart and Vallia, which caused her to go into tachycardia." (Doc. 38 at 5, para. 18). "One of the police officers called an ambulance" which "transported [her] to East Alabama Medical Center," (*Id.* at 5–6, para. 18).

Brown suffered a back sprain and "an arm/wrist sprain" and later "obtained mental health treatment . . . for emotional and psychological issues resulting from her . . . arrest and the . . . force [used to effectuate it]." (*Id.* at 6, 9, paras. 19, 28).

### C. Subsequent Proceedings

Brown was charged in state court with "Domestic Violence Third Degree." (*Id.* at 6, para. 21). On August 26, 2020, prosecutors dismissed the case "but [had her] re-arrested . . . the following day on the charges of Resisting Arrest and Obstructing Governmental Operations." (*Id.*). A warrant was issued for Brown's arrest, noting that "[p]robable cause has been found." (Doc. 40-4). On April 16, 2021, a state district court judge found Brown guilty. (Doc. 40-5). Then on November 17, 2025, after an apparently successful appeal or trial de novo, Brown prevailed upon a motion for acquittal presented to a state circuit court judge. (Doc. 38 at 9, para. 29; doc. 40-5; doc. 40-6).

## IV. ANALYSIS

### A. Vallia and Lockhart

Brown brings two federal claims against Vallia and Lockhart, false arrest (Count II) and excessive force (Count I).[6] Vallia and Lockhart assert that they are entitled to qualified immunity on those claims. Qualified immunity protects government officials from suit when they perform "discretionary functions" and "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Where a defendant asserts

[6] The Court addresses the claims in this reverse order because the facts relevant to Brown's false arrest claim chronologically precede those relevant to her excessive force claim.

qualified immunity, "the public official [must] first show[] that []he was acting within the scope of h[is] discretionary authority." *Maddox v. Stephens*, 727 F.3d 1109, 1120 (11th Cir. 2013). If the public official makes that showing, the burden then falls on the plaintiff "to show that qualified immunity is not appropriate." *Lee*, 284 F.3d at 1194. To do so, a plaintiff must show a violation of clearly established rights. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). This clearly established rights requirement entails that "officers receive qualified immunity unless they could have 'read' the relevant precedent beforehand and 'know[n]' that it proscribed their specific conduct. *Zorn v. Linton*, 146 S. Ct. 926, 930 (2026) (per curiam) (alteration in original) (quoting *City and County of San Francisco v. Sheehan*, 575 U.S. 600, 616 (2015)).

Both Vallia and Lockhart contend they were state officers who responded to an emergency call and decided to arrest Brown. (*See generally* doc. 40 at 4). The Court does not doubt—nor does Brown contend otherwise—that the act of arresting was within the scope of the officers' discretionary authority. Accordingly, the officers are entitled to qualified immunity unless "the allegations . . . establish a constitutional violation *and* that the constitutional violation was clearly established." *Ingram v. Kubik*, 30 F.4th 1241, 1251 (11th Cir. 2022) (emphasis in original) (quoting *Sebastian v. Ortiz*, 918 F.3d 1301, 1307 (11th Cir. 2019)). Ultimately, the Court finds that no Fourth Amendment violation of false arrest or excessive force was plausibly alleged and that the officers' actions did not violate clearly established law, so they are entitled to qualified immunity on Counts I and II.

### 1. False Arrest[7]

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures." U.S. CONST. amend. IV. An arrest of a person without probable cause is an unreasonable seizure. *Skop v. City of Atlanta*, 485 F.3d 1130, 1137 (11th Cir. 2007). "To succeed on a false arrest claim, a plaintiff must establish (1) a lack of probable cause and (2) an arrest." *Richmond v. Badia*, 47 F.4th 1172, 1180 (11th Cir. 2022). An arrest "occurs when the government applies physical force to seize a person or asserts lawful authority to which the subject accedes." *Id.* (citing *California v. Hodari D.*, 499 U.S. 621, 624, 626–27 (1991)); *accord Tennessee v. Garner*, 471 U.S. 1, 7 (1985) ("Whenever an officer restrains the freedom of a person to walk away, he has seized that person." (citing *United States v. Brignoni-Ponce,* 422 U.S. 873, 878 (1975)).

Probable cause exists where "the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Von Stein v. Brescher,* 904 F.2d 572, 578 (11th Cir. 1990); *see Richmond*, 47 F.4th at 1180 ("Probable cause exists when 'a reasonable officer could conclude . . . that there [is] a substantial chance of criminal activity.'" (alteration in original) (quoting *Washington v. Howard*, 25 F.4th 891, 902 (11th Cir. 2022))); *accord Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983).

---

[7] Though Brown labels her claim as "false arrest and false imprisonment," she addresses the two issues as single claim, alleging that the imprisonment was unlawful because of the arrest. (*See* doc. 38 at 13–14, para. 41–43). The Court treats the claim accordingly. *See Whirl v. Kern*, 407 F.2d 781, 790 (5th Cir. 1968) ("False arrest is merely one means of committing a false imprisonment." (quotation omitted)).

Importantly, "[n]o officer has a duty to prove every element of a crime before making an arrest." *Jordan v. Mosley*, 487 F.3d 1350, 1355 (11th Cir. 2007) (citation omitted); *cf. Scarbrough v. Myles*, 245 F.3d 1299, 1303 n.8 (2001) ("Police officers are not expected to be lawyers or prosecutors." (citation omitted)). In the same vein, "probable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts." *District of Columbia v. Wesby*, 583 U.S. 48, 61 (2018). And finally, "when the government has probable cause to arrest someone, a false arrest claim necessarily fails." *Richmond*, 47 F.4th at 1180 (citing *Crocker v. Beatty*, 995 F.3d 1232, 1245 (11th Cir. 2021)); *see Davis v. City of Apopka*, 78 F.4th 1326, 1333 (11th Cir. 2023) ("The existence of probable cause is an absolute bar to a § 1983 claim of false arrest . . . ." (citing *Marx v. Gumbinner*, 905 F.2d 1503, 1505–06 (11th Cir. 1990))).

No party disputes that an arrest occurred, and thus the outstanding issue as to Brown's false arrest claim is whether there was probable cause for her arrest. *See Richmond*, 47 F.4th at 1180. The Court finds that the investigation by Vallia and Lockhart "would cause a prudent person to believe, under the circumstances shown, that [Brown] . . . committed . . . an offense." *Von Stein,* 904 F.2d at 578. Put another way, the circumstances known to the officers were ones from which "a reasonable officer *could* conclude that there was a substantial chance of criminal activity." *Washington*, 25 F.4th at 899 (quotation omitted) (emphasis in original). Thus, there was probable cause.[8]

[8] Because the Court ultimately finds that Vallia and Lockhart had probable cause without considering that an arrest warrant later issued and that Brown was later convicted, the Court does not address the parties' arguments about whether a later-issued warrant and initially successful prosecution indicate probable cause.

When Lockhart arrived, Brown recounted that she had both hit and been hit by her brother. (Doc. 40-2 at 00:00–00:28). Lockhart then went and talked to Brown's brother, who was in a visibly worse state than Brown. Crying, he told Lockhart that he was beaten and that Brown started hitting him with a stick after forcing him to run. (*Id.* at 00:59–01:30). Brown's brother was bleeding from scratches on his arm, and he had a knot on his head; Brown's mother was attempting to treat his wounds. (*Id.* at 01:40–02:35). Brown's brother told Lockhart that he "had pieces of wood stuck in [his] arm that [he] pulled out [(himself)]." (*Id.* at 02:35–39). Brown's mother requested emergency medical services for him. (*Id.* at 02:40–45).

Brown then told both Vallia and Lockhart that she was directing her brother to exercise and that she eventually "took a lick" from him after "he got a little hold to [her]"; she also informed the officers that she "popped" her brother when he put his arm up. (Doc. 40-2 at 3:30–06:16). Then, both Vallia and Lockhart met with Brown's brother, who was still crying and reiterated his story, again stating that Brown forced him to run and hit him first. (*Id.* at 06:40–08:42). The officers then began taking steps to arrest Brown and her brother.

Plainly, the facts of which the officers were apprised were ones that from which reasonable officers "*could* conclude that there was a substantial chance of criminal activity." *Washington*, 25 F.4th at 899; *see Manners v. Cannella*, 891 F.3d 959, 968 (11th Cir. 2018) ("[Probable cause] does not require proof beyond a reasonable doubt or even by a preponderance of the evidence." (citations omitted)). Both Vallia and Lockhart were made aware that Brown—in part by her own admission—had hit her much younger brother

with a stick. They could see that her brother's skin was broken, he was bleeding, and he had a lump on his head. Both Brown and her brother made statements that could lead a reasonable officer to believe that Brown was the first aggressor.

The officers were not, as Brown suggests in her briefing, (*see* doc. 47 at 6–22), required "to rule out [her] innocent explanation for suspicious facts," *Wesby*, 583 U.S. at 61, by finding that she had engaged in self-defense, *see Davis*, 78 F.4th at 1334 ("Whatever [the plaintiff] may speculate about the information the officers could have uncovered if they had done more investigating at the scene, the officers were not required to refute his self-serving explanation that he had acted in self-defense." (citations omitted)). Nor were they required to make credibility determinations in the face of conflicting testimony by her and her brother. *See Paez v. Mulvey*, 915 F.3d 1276, 1286 (11th Cir. 2019). And under these circumstances, the officers did not need to consult the Alabama Code and determine whether Brown could mount a meritorious defense (or appeal) to a charge of domestic violence, obstruction of arrest for domestic violence, assault, menacing, reckless endangerment, disorderly conduct, or child abuse. *See id.* ("[P]olice officers aren't lawyers; we do not expect them to resolve legal questions or to weigh the viability of most affirmative defenses."); *Jordan*, 487 F.3d at 1355 ("No officer has a duty to prove every element of a crime before making an arrest." (citation omitted)); *Scarbrough*, 245 F.3d at 1303 n.8 ("Police officers are not expected to be lawyers or prosecutors." (citation omitted)).

And it is of no consequence that some of the above crimes or their less serious permutations are misdemeanors, for "the Fourth Amendment does not require a

misdemeanor to occur in an officer's presence to conduct a warrantless arrest." *United States v. Gonzalez*, 107 F.4th 1304, 1310 (11th Cir. 2024), *cert. denied*, 145 S. Ct. 529 (2025). Vallia and Lockhart were faced with an adult suspect who undisputedly hit a child with a stick to the extent that it caused the child visible injuries, and who lacked any obvious injuries herself. There is no question that a reasonable officer at the scene could conclude that Brown had committed any one of the above offenses.

In sum, the totality of the circumstances known to Vallia and Lockhart—including Brown's innocent explanation—were such that reasonable officers in their situation could conclude that there was a substantial chance of criminal activity. *Wesby*, 583 U.S. at 61. And so, they had probable cause to arrest Brown. For that reason, Brown's claim of false arrest fails as a matter of law. *Richmond*, 47 F.4th at 1180. By the same token, Vallia and Lockhart could not have gleaned that their specific conduct was proscribed by clearly established law, because it was not proscribed. *See Zorn*, 146 S. Ct. at 930; *accord Saucier v. Katz*, 533 U.S. 194, 202 (2001) ("The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct *was unlawful* in the situation he confronted." (emphasis added)). Accordingly, Vallia and Lockhart are entitled to qualified immunity on Count II.

**2. Excessive Force**

"The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest." *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002) (citing *Graham v. Connor,* 490 U.S. 386, 394–95 (1989)). "In determining the reasonableness of the force applied,

[courts] look at the fact pattern from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts, and balance the risk of bodily harm to the suspect against the gravity of the threat the officer sought to eliminate." *McCullough v. Antolini*, 559 F.3d 1201, 1206 (11th Cir. 2009). To make this assessment, "a court must look at the 'totality of the circumstances.'" *Johnson*, 107 F.4th at 1302 (quoting *Garner*, 471 U.S. 1, 9).

Though "[t]here is no 'easy-to-apply legal test' or 'on/off switch' in this context," *Barnes v. Felix*, 605 U.S. 73, 80 (2025), cases have identified non-exhaustive factors that courts should consider, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [s]he is actively resisting arrest or attempting to evade arrest by flight," *Graham*, 490 U.S. at 396, and "the need for application of force, the relationship between the need and amount of force used, and the extent of the injury inflicted by the arresting officer." *Helm v. Rainbow City*, 989 F.3d 1265, 1273 (11th Cir. 2021) (citation omitted). And in evaluating the arrest, courts must "consider the officers' actions 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Oliver v. Fiorino*, 586 F.3d 898 (11th Cir. 2009) (quoting *Kesinger ex rel. Est. of Kesinger v. Herrington,* 381 F.3d 1243, 1249 (11th Cir. 2004)).

In examining the totality of the circumstances, Vallia and Lockhart's actions were reasonable, and thus Brown's claim of excessive force fails. Here, Vallia and Lockhart were arresting Brown for a crime of violence. Brown's actions preceding and during her arrest were erratic. Initially, when Brown was informed by her mother that she was going

to be arrested, Brown fled into her house against the requests of her mother and Vallia. (Doc. 40-3 at 02:24–48). She was in the house for approximately eight minutes while the officers waited outside. (*Id.* at 02:48–10:40). In the interim, Brown's mother entered the house and later exited without Brown, telling Vallia and Lockhart that she was not inside. (*Id.* at 04:18–39).

When Brown emerged from the house, she immediately told Vallia and Lockhart, "I have a right to defend myself. I'm not go[ing] to sit there and get my ass whooped. He came at me and I did the best I could do." (*Id.* at 10:47–11:04). At the same time, Brown's mother told the officers, "she took a butt load . . . of pills . . . that's all I can tell you." (*Id.* at 10:53–11:01).

When Lockhart told Brown to present her hands for cuffing, she began to move away from the officers, saying "nuh uh," and walked toward her house. (*Id.* at 11:03–09). She had her hands in front of her, out of the sight of the officers; Vallia yelled, "get your hands out of your pockets." (*Id.* at 11:09–12). Brown did not comply but instead partially lowered herself to the ground with her hands still out of view. (*Id.* at 11:09–22). Vallia again directed Brown to comply and put her hands behind her back, warning her that she would be tased if she failed to comply. (*Id.* at 11:18–22). Brown then yelled at the officers, "if you tase me, I'm taking you to court." (*Id.* at 11:30–35).

Vallia grabbed Brown's left arm; Lockhart pressed his taser against Brown's back and told her to place her hands behind her back. (*Id.* at 11:35–37). Brown placed her right hand behind her back while Vallia fastened a cuff on her left wrist. (*Id.* at 11:34–38). However, with the handcuff affixed to her left arm, Brown continued to struggle against

the officers. Lockhart again had to tell Brown to put her hands behind her back. (*Id.* at 11:38–42). And as Vallia attempted to pull both of Brown's wrists together, (*id.* at 11:44–46), Brown stated loudly, "I can't take this," and continued to resist the officers. (*Id.* at 11:46–47). At that point, Brown was tased.

So, viewing the facts in the light most favorable to Brown, before Lockhart engaged his taser: Brown had twice moved away from officers, first by taking refuge in her house for eight minutes and later by walking toward the house again. She was told to put her hands behind her back three times and warned that her failure to comply would result in her tasing. Throughout, she yelled exasperated statements that a reasonable officer could perceive as threatening and indicative of motivation to resist further. Her physical resistance to the arrest persisted until the deployment of the taser, as she yelled, "I can't take this" and continued to struggle with a single cuff on her left arm. *See Hoyt v. Cooks*, 672 F.3d 972, 979 (11th Cir. 2012) ("[W]ithout both hands shackled, the single handcuff could be used as a weapon."). These circumstances are not those where "a suspect has been subdued, is not resisting, and poses no threat." *Saunders v. Duke*, 766 F.3d 1262, 1269–70 (11th Cir. 2014). Thus, the officers were entitled to use force to effectuate Brown's arrest. *See Wate v. Kubler*, 839 F.3d 1012, 1021 (11th Cir. 2016) ("[N]oncompliance or continued physical resistance to arrest justifies the use of force by a law enforcement officer." (citation omitted)).

After Lockhart engaged his taser,[9] (doc. 40-3 at 11:47–51), the officers were quickly able to effectuate Brown's handcuffing without issue, and she was compliant for the remainder of her arrest, (*id.* at 11:51–15:35, 15:40–55; *but see id.* at 15:36–43)). These circumstances provide substantially similar justification to others where the Eleventh Circuit has found the use of a taser was reasonable.

> From the time [the suspect] met [the officer] at the back of the truck [for a traffic stop for an unilluminated tag], [the suspect] was hostile, belligerent, and uncooperative. No less than five times, [the officer] asked [the suspect] to retrieve documents from the truck cab, and each time [the suspect] refused to comply. Rather, [the suspect] accused [the officer] of harassing him and blinding him with the flashlight. [The suspect] used profanity, moved around and paced in agitation, and repeatedly yelled at [the officer]. Because [the suspect] repeatedly refused to comply with [the officer's] verbal commands, starting with a verbal arrest command was not required in these particular factual circumstances. More importantly, a verbal arrest command accompanied by attempted physical handcuffing, in these particular factual circumstances, may well have, or would likely have, escalated a tense and difficult situation into a serious physical struggle in which either [the suspect] or [the officer] would be seriously hurt. Thus, there was a reasonable need for some use of force in this arrest.
>
> Although being struck by a taser gun is an unpleasant experience, the amount of force [the officer] used—a single use of the taser gun causing a one-time shocking—was reasonably proportionate to the need for force and did not inflict any serious injury. Indeed, the police video shows that [the suspect] was standing up, handcuffed, and coherent shortly after the taser gun stunned and calmed him. The single use of the taser gun may well have prevented a physical

[9] Brown states that the Court must credit her well-plead factual allegations in her complaint, specifically that during her arrest she "was tased more than one time" and that she "was tased at least one time, and possibly two times, while she was handcuffed with her hands behind her back." (Doc. 47 at 28; doc. 4 at 7, para. 22). However, because "[the] video is clear and obviously contradicts [Brown's] alleged facts, [the Court] accept[s] the video's depiction instead of the complaint's account, and view[s] the facts in the light depicted by the video." *Baker*, 67 F.4th at 1277–78 (citing *Gee*, 625 F.3d at 1315; *Harris*, 550 U.S. at 381).

> struggle and serious harm to either [the suspect] or [the officer]. Under the "totality of the circumstances," [the officer's] use of the taser gun did not constitute excessive force, and [the officer] did not violate [the suspect's] constitutional rights in this arrest.

*Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004); *see Buckley v. Haddock*, 292 F. App'x 791, 794 (11th Cir. 2008)[10] (no excessive force by two five-second tases of a handcuffed suspect (for failing to sign traffic citation) lowered himself to the ground prone and would not rise as ordered); *Moore v. Gwinnett County*, 805 F. App'x 802, 807 (11th Cir. 2020) (per curiam) (no excessive force by a single five-second taser shock after warning where suspect (for moving sublessee's property from home) failed to put her hands behind her back); *Alday v. Groover*, 601 F. App'x 775, 776–77, 779 (11th Cir. 2015) (per curiam) (no violation of clearly established excessive force law by a five- to ten-second tase to the neck of a handcuffed suspect (for driving under the influence) in the back of a police vehicle when she did not exit as ordered); *see also Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1299, 1306 (11th Cir. 2009) (no excessive force by three tases on a handcuffed and leg shackled suspect in the back of police car who was kicking and slamming her head against car doors).

One consideration that potentially weighs in Brown's favor is "the extent of the injury inflicted." *Helm*, 989 F.3d at 1273. But Brown's tachycardia and emotional-psychological issues—assuming at this stage that they were caused by the tasing rather than the large dose of pills consumed—were not predictable injuries of a single, four-

---

[10] Here, and elsewhere in this Opinion, the Court cites nonbinding authority. While the Court acknowledges these cases are nonprecedential, the Court finds them persuasive.

second tasing of the upper back. *See Rodriguez v. Farrell*, 280 F.3d 1341, 1352 (11th Cir. 2002) ("What would ordinarily be considered reasonable force does not become excessive force when the force aggravates (however severely) a pre-existing condition the extent of which was unknown to the officer at the time."); *see also Mann*, 588 F.3d at 1306 (not excessive force where death resulted after three tases); *Moore*, 805 F. App'x at 809–10 (not excessive force where arrestee lost consciousness and had permanent scarring following a single tase); *cf. Marbut v. Phillips*, 176 F.4th 1256, 1268 (11th Cir. 2026) ("[*D*]*e minimis* force do[es] not cease to be *de minimis* when [it] produce[s] unexpected injuries."). And moreover, Brown does not plausibly allege that Vallia and Lockhart were aware of any special conditions that would render the otherwise ordinary measure for effectuating an arrest of a resisting suspect likely to cause the injuries she alleged later manifested.[11]

[11] Though Brown's excessive force claim and subsequent briefing focus almost exclusively on the tasing, (*see* doc. 38 at 10–12; doc. 40 at 15–17; doc. 47 at 28–31; doc. 50 at 19–20), she briefly mentions another discrete use of force—Brown was allegedly lifted by her handcuffs by Officer Lockhart to effectuate her transfer to the police car, (*see* doc. 38 at 5, para. 16; doc. 40-3 at 12:16–35). It does not appear to the Court that this action forms the basis of any part of her excessive force claim. But even if it did, Brown's claim would fail. Viewing the facts in the light most favorable to Brown, she was handcuffed, calmer, and appears to present no threat to the officers. But the video does not show the "extremely rough treatment" alleged in the complaint. (Doc. 38 at 7, para. 23). Instead, as Lockhart allegedly attempted to lift Brown and she screamed, both the off-duty officer and her mother told her to "calm down" and "settle down." (Doc. 40-3 at 12:28–34). The off-duty officer also told her "you have to be still." (*Id.* at 12:38–45). Brown's mother showed Lockhart her own hand and laughed. (*Id.* at 12:53–57). And Lockhart ultimately loosened Brown's handcuffs. (Doc. 40-3 at 12:40–13:39; doc. 38 at 5, para. 16). Shortly thereafter, Lockhart helped Brown stand without issue. (Doc. 40-3 at 13:40–14:03). Brown variously requested, in a calm tone, that her mother "take the dip out of [her] pocket," (*id.* at 13:15–20), call two different people whose contacts are in her phone, (*id.* at 13:57–14:05), and "grab [her] pen from him," (*id.* at 14:09–14:15). Brown does not allege that any permanent physical injury resulted from the brief handcuffing incident. Here, "the actual force used and the injury inflicted were both minor in nature." *Jones v. City of Dothan*, 121 F.3d 1456, 1460 (1997). Accordingly, it was not force—even paired with the single tase—violative of the Fourth Amendment.

Considering the totality of the circumstances, the Court finds that Brown has not plausibly plead facts which constitute excessive force. And like Brown's false arrest claim, Vallia and Lockhart could not have gleaned that their specific conduct was proscribed by clearly established law. Accordingly, Vallia and Lockhart are entitled to qualified immunity on Count I.

**B. The City**

Because the Court found that Brown has not plausibly alleged facts to establish Vallia or Lockhart's actions amounted to constitutional violations of false arrest or excessive force, the City cannot be liable under § 1983 for those actions. *See Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998) ("[A] municipality may be held liable for the actions of a police officer only when municipal 'official policy' *causes a constitutional violation*." (emphasis added) (citing *Monell*, 436 U.S. at 694–95)); *see also Smothers v. Childers*, 159 F.4th 922, 931 (11th Cir. 2025); *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004). Because Brown fails to state a claim against the City on Counts I and II, those claims against it are due to be dismissed.

**C. State Law Claims**

The Court is granted discretion "to decline to exercise supplemental jurisdiction over [related state law claims] if [it] has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1391(c)(3). Even so, precedent strongly counsels in favor of dismissal. *Silas v. Sheriff of Broward Cnty.*, 55 F.4th 863, 866 (11th Cir. 2022) ("[C]oncerns of federalism—namely, of federal courts of limited jurisdiction weighing in on state law—counsel in favor of dismissing state-law claim after the federal claims are

dismissed."); *Raney v. Allstate Ins.*, 370 F.3d 1086, 1089 (11th Cir. 2004) ("We have encouraged district courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial."); *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise [pendent] jurisdiction . . . ."); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."). Dismissal of state law claims on this discretionary basis "usually should [be] do[ne] . . . without prejudice as to refiling in state court." *Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1298 (11th Cir. 2018) (citation omitted).

Here, the considerations of judicial economy and convenience to the parties do not outweigh the interests guaranteed by declining to exercise supplemental jurisdiction in this posture. Proceedings in state court would "promote justice between the parties[] by procuring for them a surer-footed reading of applicable [state] law"—furthering fairness—and advance comity by avoiding the "[n]eedless [federal] decisions of state law." *Gibbs*, 383 U.S. at 726. Thus, the balance of factors counsel in favor of declining to exercise supplemental jurisdiction over the outstanding state law claims. Accordingly, the Court finds that Counts III and IV are due to be dismissed without prejudice.

## V. CONCLUSION

For the reasons stated, and for good cause, it is

ORDERED as follows:

1. The Defendants' motion to dismiss, (doc. 39), is GRANTED as to Counts I and II, and these Counts are DISMISSED with prejudice.

2. The Court declines to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1391(c) as to Counts III and IV, and these Counts are DISMISSED without prejudice.

3. This case is DISMISSED.

4. A separate and final judgment will be entered.

DONE this 20th day of August, 2026.

/s/ Emily C. Marks
EMILY C. MARKS
UNITED STATES DISTRICT JUDGE